1   JOSEPH W. COTCHETT (#36324)
    BRUCE L. SIMON (#96241)
2   NANCY L. FINEMAN (#124870)
    KELLY L. BULAWSKY (#234025)
3   **COTCHETT, PITRE, SIMON & McCARTHY**
    840 Malcolm Road, Suite 200
4   Burlingame, CA 94010
    Telephone: (650) 697-6000
5
    *Attorneys for Plaintiff Trotter-Vogel Realty,*
6   *Inc. dba Prudential California Realty*

7

8                                                              WDB

9              **UNITED STATES DISTRICT COURT**

10        **FOR THE NORTHER DISTRICT OF CALIFORNIA**

11                                      C 05 3028

    **TROTTER-VOGEL REALTY,**          ) CASE NO.
12  **INC. dba PRUDENTIAL**            )
    **CALIFORNIA REALTY,**             ) **CLASS ACTION COMPLAINT**
13  individually, and on behalf of all ) **FOR:**
    those similarly situated,           )
14                                      ) **1. VIOLATION OF**
                    Plaintiff,          )    **ANTITRUST ACT**
15                                      )
         v.                             ) **2. VIOLATION OF CARTWRIGHT**
16                                      )    **ACT**
    **INTEL CORPORATION,**             )
17                                      ) **3. VIOLATION OF UNFAIR**
                    Defendant.          )    **COMPETITION LAW**
18  _____   )
                                        ) **DEMAND FOR JURY TRIAL**
19

20

21

22

23

24

25

26

27

28

                        **COMPLAINT**

## TABLE OF CONTENTS

**PAGE**

I. **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. **JURISDICTION AND VENUE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. **THE PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1. INTEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2. UNNAMED PARTICIPANTS . . . . . . . . . . . . . . . . . . . . . . . 3

IV. **CLASS ACTION ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V. **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A. MANUFACTURERS OF MICROPROCESSORS . . . . . . . . . . . . . 5

        1. INTEL AND AMD ENTER INTO A SECOND SOURCE CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B. THE 1990s SAW INTEL CONTINUE ITS DOMINANCE IN THE MICROPROCESSOR CHIP INDUSTRY WITH COMPETITION AND INNOVATION FROM AMD AND OTHER MANUFACTURERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C. THE TRUTH ABOUT INTEL'S UNLAWFUL ACTS IS RECENTLY REVEALED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1. JAPANESE FAIR TRADE COMMISSION'S CHARGES . 11

        2. THE EUROPEAN COMMISSION'S INVESTIGATION . . 12

        3. THE AMD LAWSUIT AGAINST INTEL . . . . . . . . . . . . . 13

            a. Dell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            b. Sony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            c. Toshiba . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            d. NEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            e. Fujitsu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            f. Hitachi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            g. Gateway/eMachines . . . . . . . . . . . . . . . . . . . . . . . . 15

|     |    | h. | Hewlett Packard ........................... | 16 |
|     |    | i. | IBM ...................................... | 16 |
|     |    | j. | Rebates, Threats and Other Unlawful Acts ......... | 16 |
|     |    | k. | Monopolization of Retailers' and Distributors' Markets ........................... | 18 |
|     | D. | RELEVANT MARKET ................................ | 19 |
|     | E. | THE EFFECT OF INTEL'S ACTS HAS BEEN TO DECREASE COMPETITION, DECREASE CONSUMER CHOICE AND INCREASE PRICES ..................................... | 19 |
|     | F. | TOLLING OF THE STATUTE OF LIMITATIONS ........... | 20 |

**FIRST CLAIM FOR RELIEF**
    VIOLATION OF ANTITRUST ACT AND
    REQUEST FOR INJUNCTION AND DECLARATORY RELIEF
    (15 U.S.C. §§ 2, 26; 28 U.S.C. § 2201(a)) ........................ 20

**SECOND CLAIM FOR RELIEF**
    VIOLATION OF CARTWRIGHT ACT
    AND REQUEST FOR DAMAGES
    (California Business & Professions Code §§ 16700, et seq.) ........... 22

**THIRD CLAIM FOR RELIEF**
    VIOLATION OF UNFAIR COMPETITION LAW AND
    REQUEST FOR RESTITUTION AND INJUNCTION
    (California Business & Professions Code §§17200 *et seq.*) ............ 23

**PRAYER FOR RELIEF** ........................................ 25

**JURY TRIAL DEMAND** ...................................... 26

1    Plaintiff, Trotter-Vogel Realty, Inc. dba Prudential California Realty
2  individually and on behalf of all those similarly situated, alleges on information
3  and belief, *inter alia*, based upon an investigation conducted by Plaintiff and its
4  counsel, except as to those allegations pertaining to Plaintiff and its counsel
5  personally which are alleged based upon knowledge.

6  **I.    INTRODUCTION**

7    1.    For more than twenty years, defendant Intel Corporation ("Intel") has
8  dominated the microprocessor market with more than an 80% market share even
9  though its main competitor, Advanced Micro Devices ("AMD") and other
10  manufacturers had lower prices and competitive products.  Intel has always
11  claimed that it competed legally and its dominance was based on a superior
12  product.  Microprocessors are a vital component in computers as they are
13  semiconductor chips that perform the bulk of the central processing functions of
14  personal computers, video game consoles and other electronics products.

15    2.    Recently evidence disclosed through governmental investigations by
16  the Japanese and Europeans and a lawsuit filed by AMD show that Intel has
17  engaged in a continuing course of conduct, alone and with others, to monopolize
18  the microprocessor market by threats, retaliation, and secret rebates and discounts.
19  This evidence includes the following:

20    •    Gateway's executives have disclosed that Intel pays the
21       company substantial amounts of money so that it will not deal
22       with Intel's competitors and when Gateway purchased a limited
23       amount from AMD, Intel retaliated against them.

24    •    Intel, through its Japanese subsidy, paid five Japanese
25       companies to refrain from putting non-Intel microprocessors
26       into their computers.  As a result, competition has decreased
27       and Intel now has about 90% of the Japanese market.

28

---

- International Business Machines dropped a proposed partnership with AMD to become the preferred supplier for Intel based upon substantial payments it received from Intel.
- Intel withheld delivery to Compaq Computer of much needed server chips in order to punish Compaq for doing business with AMD.
- Intel's officers threatened Acer's President and CEO, that Acer would suffer severe consequences if it supported AMD's launch of a microprocessor called the Athlon64. In response, Acer withdrew its support.
- Intel has, through advertising monies and market development funds, paid distributors and retailers not to use non-Intel products thereby unlawfully increasing its market share.

These are but a few examples of the unlawful conduct by Intel.

3.     The result of this anti-competitive behavior by Intel and others has been to increase the price of personal computers and other products which require microprocessors to operate, and decrease consumer choice because many companies will not put Intel's competitors' microprocessors into their products and/or will not sell Intel's competitors' products.

4.     This lawsuit seeks redress for the named Plaintiff and other businesses and consumers who purchased Intel microchips over the past four years.

## II.     JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and § 1337(a), and 15 U.S.C. § 26. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

6.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and California Business & Professions Code § 16750(a). Intel is

---

COMPLAINT                                                              2

1  headquartered and/or performs business in this District, and a substantial part of

2  the events, acts, omissions and transactions complained of herein occurred in this

3  District.

4  **III.    THE PARTIES**

5        **A.    PLAINTIFF**

6        7.    Plaintiff Trotter-Vogel Realty, Inc. dba Prudential California Realty

7  ("Prudential") is an independently owned and operated member of Prudential Real

8  Estate Affiliates, Inc. with its principal place of business in San Bruno, California.

9  It is one of the premier real estate companies on the Peninsula and has been in

10  business since 1959. With over 120 agents, it has purchased more than 200

11  computers over the last ten years, primarily Dell computers with Intel

12  microprocessors. Its office staff and real estate agents currently use about 100

13  computers with Intel microprocessors.

14        **B.    DEFENDANT**

15              **1.    INTEL**

16        8.    Defendant Intel Corporation ("Intel") is the largest microprocessor

17  manufacturer in the world and has commanded and continues to command about

18  an 80% worldwide market share. It is a Delaware corporation with its principal

19  place of business in Santa Clara, California.

20              **2.    UNNAMED PARTICIPANTS**

21        9.    Numerous individuals and separate business entities participated

22  actively during the course of and in furtherance of the conspiracy, and many acts

23  were done in the course of and in furtherance of the conspiracy. The individuals

24  and entities acted in concert and pursuant to agreement with the purpose and effect

25  of artificially inflating the price of products which have microprocessors in them,

26  destroying competition in that market by knowingly agreeing with Intel to shut

27  Intel's competitors' out of the microprocessor market and performing acts with the

28  intent to decrease competition. They also acted as agents for principals to advance

---

**COMPLAINT**                                                                3

1  the objectives of the conspiracy.  The acts were intended to promote the objectives

2  of the conspiracy.

3  **IV.    CLASS ACTION ALLEGATIONS**

4      10.    Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil

5  Procedure, Plaintiff Prudential brings this lawsuit on behalf of itself, and a class of

6  persons and entities ("the Class") who purchased any product containing Intel

7  microprocessors, other than for resale or distribution, during the last four years in

8  California.  Excluded from the Class are: Defendants and their subsidiaries,

9  successors, predecessors, present and former officers and directors, and members

10  of their immediate families and any legal representatives, agents, affiliates, heirs,

11  successors-in-interest or assigns of any excluded party.

12      11.    This action is properly maintainable as a class action because it meets

13  Rule 23 requirements for numerosity, commonality, typicality and superiority.

14      12.    The Class is numerous and spread across California thus making the

15  joinder of all Class members impracticable.  Though the exact number of members

16  of the Class is unknown to Plaintiff at this time, hundreds of thousands of

17  microprocessors are sold in California each year.  Information as to the identify of

18  the Class members can be readily determined from sales records of Intel products

19  and other methods.

20      13.    The following are questions of law and fact common to the class,

21  which predominate over questions affecting individual members:

22      a.    Whether Intel has engaged and is engaging in anti-competitive

23            conduct.

24      b.    Whether Intel is engaging in a combination or conspiracy to engage

25            in anti-competitive conduct.

26      c.    Whether Intel's acts violate 15 U.S.C. § 2, the Sherman Act § 2.

27      d.    Whether Intel's acts violate California Business and Professions Code

28            §§ 16700 *et seq.*, the Cartwright Act.

e.      Whether Intel's acts violate California Business and Professions Code §§17200 *et seq.*, the Unfair Competition Law.

f.      Whether Plaintiff and the Class have been damaged by Intel's anticompetitive acts, and if so the proper measure of damages to award Plaintiff and the Class.

g.      Whether Plaintiff and the Class are entitled to declaratory or injunctive relief.

14.      Plaintiff's claims are typical of those asserted by the other Class Members and Plaintiff's interests are not adverse or antagonistic to the interests of the Class.

15.      Plaintiff will vigorously prosecute this action using the competent counsel it has retained. Plaintiff's counsel is experienced in class action antitrust litigation. Hence, Plaintiff is an adequate representatives for the Class and will represent their interests fairly and adequately. Plaintiff does not anticipate any problem with managing this litigation as a class action.

16.      The class mechanism is an efficient and fair method for adjudicating this action and is superior to other methods. The size of the Class would make other methods impracticable and without the use of the class mechanism, many individual Class members might not be able to afford or prosecute their individual claims.

## V.     FACTUAL BACKGROUND

### A.     MANUFACTURERS OF MICROPROCESSORS

17.      Intel, AMD, VIA Technologies and Transmeta are the current producers of microprocessor chips used in personal computers (desktop and notebooks), mobile telephones and personal electronics.

18.      **Intel** has been by far the dominant company in the industry over the last 20 years, primarily competing with AMD for market share. It was founded in 1968 by Bob Noyce and Gordon Moore. It is the world's largest semiconductor

1  chip maker, supplying advanced technology solutions for the computing and

2  communications industries.   Intel's products include chips, boards and other

3  semiconductor components that are the building blocks integral to computers,

4  servers, and networking and communications products.  It employs about 80,000

5  people and has operations in the United States, Europe, Japan China, Taiwan and

6  the Asia Pacific.  Its net income has increased from $1.29 billion in 2001 to $3.11

7  billion in 2002 to $5.64 billion in 2003 and to $7.51 billion in 2004.

8      19.   **AMD**, a leading semiconductor company with manufacturing

9  facilities in the United States, Europe and Asia, and sales offices throughout the

10  world, was incorporated in Delaware in 1969.  Based in Sunnyvale, California, it

11  designs, manufactures and markets microprocessor chips and industry-standard

12  digital integrated circuits, or ICs, that are used in diverse product applications

13  such as desktop and mobile personal computers, workstations, servers,

14  communications equipment such as mobile telephones, and automotive and

15  consumer electronics. AMD as of the beginning of 2005 had approximately 8,300

16  employees and its subsidiary Spansion an additional 7,600.

17      20.   **VIA Technologies**, now headquartered in Taiwan, was founded in

18  1987.  In 1999, it entered the microprocessor market and in February of 2005

19  celebrated the production of its 100 millionth VIA AMD chipset. While its

20  microprocessors generally sell at a lower price than Intel's chips, VIA

21  Technologies has been unable to obtain more than a very small market share, less

22  than 5%.  In 2003, Intel and VIA Technologies settled 11 patent lawsuits pending

23  since 2001 in five countries.  The companies entered into a ten-year patent cross-

24  license agreement for each other's products.

25      21.   **Transmeta** was founded in 1995.  According to its 2004 10-K:

26  "[O]ur business model was focused primarily on designing, developing and selling

27  highly efficient x86-compatible software-based microprocessors. We believe that

28  our microprocessor products deliver a compelling balance of low power

---

**COMPLAINT**                                                                        6

consumption, high performance, low cost and small size. These advantages are
valuable to a broad range of computing platforms, especially battery-operated
mobile devices and applications that need high performance, low power
consumption and low heat generation. Such platforms include notebook
computers, ultra-personal computers, or UPCs, tablet PCs, thin clients, blade
servers and embedded computers. We currently supply our products to a number
of the leading companies in the computer industry, such as Fujitsu,
Hewlett-Packard, and Sharp. Our products include our Crusoe® and Efficeontm
families of microprocessors." Its early customers included Sony, Casio, Fujitsu
and NEC, but its global market share has always remained minuscule.

### 1. INTEL AND AMD ENTER INTO A SECOND SOURCE CONTRACT

22.     Intel obtained the first competitive advantage in the computer chip
industry when International Business Machines ("IBM") selected Intel's 8086
microprocessor chip to use in one of its first successful personal computers.  In
about <u>August of 1981</u>, IBM shipped its first personal computer using the Intel
microprocessor.  The personal computer and its successors were a tremendous
success earning enormous profits for IBM, Intel and Microsoft, which supplied the
software for the computer.

23.     Shortly after the success of the IBM personal computer, AMD was
able to capitalize on this success because, at that time, IBM required that there be
a "second source" for the chips it used in its computers to ensure an adequate
supply.  Thus, in <u>February of 1982</u>, Intel and AMD entered into a ten-year
contract, which could be cancelled after five years.  The preamble stated that the
agreement was intended "to establish a mechanism for exchanging technical
information so that each party acquires the capability to develop products suitable
for sale as an alternate source for products developed by the other party."  The
agreement provided that either company could elect to be a second source for

---

products developed by the other party. In return for a royalty payment, the company developing the product would provide the other company with technical information and the licenses needed for it to make and sell the product. The contract specified an equation to be used to determine the value of the products.

24. Under the contract, AMD obtained second-source rights to Intel's 8086 chip and other specified products for cash. After 1985, AMD would have open access to Intel's products as long as Intel agreed to accept AMD product of sufficient value.

25. In 1984, the parties amended the contract wherein AMD obtained the second-source rights to Intel's 8016 and 80286, the successor to the 8086 and agreed to pay substantial royalties to Intel. If Intel accepted AMD products, then AMD was to have access to all of Intel's line of products without needing to pay royalties.

26. AMD had to sue Intel because of Intel's breaches of the contract. An arbitrator awarded AMD $10 million in damages and the right to use Intel's intellectual property in its Am386 chip.

**B. THE 1990s SAW INTEL CONTINUE ITS DOMINANCE IN THE MICROPROCESSOR CHIP INDUSTRY WITH COMPETITION AND INNOVATION FROM AMD AND OTHER MANUFACTURERS**

27. During the 1990s, Intel and AMD were the primary microchip producers with some competition from VIA Technologies and Transmeta, and there appeared to be much innovation and competition in the industry.

28. In the early part of the decade, AMD continued to clone Intel's microchips. In <u>1991</u>, AMD introduced its Am386 followed by the Am486 in 1993. Both were very popular and sold for less than the comparable Intel chip. The AM386 chip sold more than one million units within the first year. Compaq and other large OEMs (Original Equipment Manufacturers, companies that customize computers and sell them under their own name) used the Am486.

---

**COMPLAINT**                                                                 8

29.    In <u>1993</u>, Intel released its Pentium CPU and then followed up with
the Pentium Pro. In its 10-K filed with the Securities Exchange Commission for
1994, Intel said, "The Pentium® processor, introduced in 1993, ramped into high
volume in 1994 and was the major factor in Intel's overall revenue growth from
1993 to 1994." Net revenue for 1994, according to the 10-K was $11,521,000.

30.    In 1995, AMD responded by producing the K5, the first completely
in-house AMD processor which was to compete with the Pentium which was
followed by the K6.  In <u>January 1999</u>, AMD release the 450 Mhz K6-III, the final
iteration of the K6 series which directly competed with Intel's top of the line
chips.  The K6 series was priced lower than the Intel chips, but the perception in
much of the marketplace was that it did not perform as well as the Intel chips.
Intel introduced a lower-priced Celeron chip, a version of its Pentium chip, to
compete with AMD.  This competition was good for computer prices because of
the continuing innovation which made for better products.

31.    Also in <u>1995</u>, Transmeta was founded and started production of its
microprocessors.  Transmeta's entry into the market should have increased
competition, but Transmeta has never been able to obtain a significant market
share.

32.    In <u>early 1999</u>, Intel introduced the lower-priced Celeron Chip, and a
price war with AMD and others followed.

33.    In <u>August of 1999</u>, AMD introduced its Athlon (K7) processor which
sent shock waves through the industry because of its excellent performance.  In
<u>March of 2000</u>, AMD announced the even more advanced Athlons.  Intel had
trouble responding to these new AMD products.  At the same time that AMD was
introducing its new Athlons, Intel introduced its 1 Ghz Pentium, but was unable to
ship it.  AMD continued to be lower in price at the lower end of the chip market
and it benefitted from Intel's part shortages and yield problems.  As a result of
AMD's work, its market share, at one point, hit 23%, the highest it has ever

1   reached. Intel, AMD, VIA Technologies and Transmeta kept refining and

2   improving their microprocessors.

3        34.   On <u>September 29, 1999</u>, Johan De Gelas in *Ace's Hardware* wrote in

4   an article entitled "Is AMD Ready for the High-End/Server Market?":

> AMD has never been so close to Intel as it is now, the
> K6-III 450 can compete with the PIII-500 in business
> applications, and it is, in terms of clock speed right
> behind Intel. The fastest K6-2 clocks at 475 MHz, Intel's
> highest-clocked processor attains 500 MHz.
>
> Although AMD is capturing a big part of US retail
> market, and is making progress in the European retail
> market (an Intel stronghold), AMD investors can't really
> be happy since AMD makes no profits. AMD, who
> issued three profit warnings in the first quarter before
> posting a $128 million loss, is really testing the patience
> of its investors.
>
> Additionally, Intel's Celeron has successfully put the
> AMD's profit margins under great pressure, AMD is
> practically giving away their CPUs. The K7, however,
> should do much more than defend AMD's position, it
> should attack Intel's high margin, high-end market. Not
> only is the architecture of the K7 more advanced, the K7
> is a deeply pipelined CPU, already running at 600 MHz
> using conventional cooling, higher than the fastest
> offering from Intel (PIII 550 MHz).

17        35.   Transmeta also propelled Intel to be more innovative. According to a

18   <u>November 5, 2001</u> article in news.com, "Between January 2000–when Transmeta

19   introduced the chip–and the delivery of Transmeta's first chips nine months later,

20   Intel started work on a new line of energy-efficient processors and began to

21   promote them heavily with major computer makers such as IBM. [¶] Several PC

22   maters, including IBM, Compaq Computer and Dell Computer, purchased Intel's

23   low-power chips rather than Transmeta's. As recently as Tuesday, Sharp said it

24   would stick with Intel's energy-efficient chips for its notebooks sold in the United

25   States, although it sells a Transmeta notebook in Japan."

26        36.   In <u>April of 2003</u>, AMD introduced its Opteron chip to rave reviews.

27   As a result of AMD's introduction of Athlon and then Operon, AMD appeared

28   poised to challenge Intel's dominance in the market in the new century. The

---

**COMPLAINT**

1  actual results, however, did not meet these expectations.  According to AMD, its
2  market share has only increased by 2% in the two years since Operon was
3  launched.  VIA Technologies and Transmeta have only been able to obtain small
4  market shares.  No matter what competitors did in terms of quality or price, Intel
5  continued to dominate the microprocessor market.

## C.   THE TRUTH ABOUT INTEL'S UNLAWFUL ACTS IS RECENTLY REVEALED

37.   The true reason for the lack of competition in the marketplace has
been revealed only recently: rather than compete honestly and fairly, Intel has
coerced major customers into exclusive deals in return for cash payments,
discriminatory pricing or market subsidies.  The information about Intel's
competitive practices has been revealed through an almost one-year investigation
by the Japanese Fair Trade Commission ("JFTC"), an investigation by the
European Commission and a lawsuit filed by AMD against Intel.

### 1.   JAPANESE FAIR TRADE COMMISSION'S CHARGES

38.   On March 8, 2005, the JFTC rendered an opinion that Intel's wholly
owned subsidiary, Intel Kabushiki Kaisha ("IJKK") had substantially restrained
competition in the market for CPUs sold to the five Japanese personal computer
makers (Toshiba, Sony, NEC, Fujitsu and Hitachi).  The report states:

> IJKK, since May 2002, has made the five major Japanese
> OEMs refrain from adopting competitors' CPUs for all
> or most of the PCs manufactured and sold by them or all
> of the PCs that belong to specific groups of PCs referred
> to as 'series', by making commitments to provide the
> five OEMs with rebates and/or certain funds referred
> as 'MDF' (Market Development Fund) in order to
> maximize their MSS, respectively, on condition that
>
> > (a) the Japanese OEMs make MSS at 100%
> > and refrain from adopting competitors'
> > CPUs.
> >
> > (b) the Japanese OEMs make MSS at 90%,
> > and put the ratio of competitors' CPUs in
> > the volume of CPUs to be incorporated into
> > the PCs manufactured and sold by them
> > down to 10%; or

---

COMPLAINT                                                                11

1      (c) the Japanese OEMs refrain from
       adopting competitors' CPUs to be
2      incorporated into PCs in more than one
       series with comparatively large amount of
3      production volume to others.

4      Based on the facts mentioned above, the ratio of the sales
       volume by AMDJapan and Transmeta USA among Total
5      Domestic CPU Sales Volume decreased from
       approximately 24% in 2002 to approximately 11% in
6      2003.

7      By means of such conducts, IJKK has substantially
       restrained the competition in the market of CPUs sold to
8      the Japanese OEMs, by acting to exclude its competitors'
       business activities related to the sales of CPUs to the five
9      OEMs.

10     39.     To stop these illegal practices, the JFTC recommended that Intel

11  notify its customers and employees that it may no longer provide rebates and other

12  funds to Japanese computer manufacturers in exchange for conditions that exclude

13  competitors' CPUs.

14     40.     In March of 2005, Intel's Japanese subsidiary, Intel KK agreed to

15  abide by most of the conditions demanded by the JFTC.  On March 31, 2005, Intel

16  issued a press release, found at http://www.intel.com/pressroom/archive/releases/

17  20050331corp.htm with the headline "Intel Agrees to Comply with JFTC

18  Recommendation; Disagrees with Findings of Fact" announcing that its Japanese

19  subsidiary agreed to accept the Recommendation from the JFTC.  The acts of

20  Intel's subsidiary are attributable to Intel who directed and endorsed these acts.

21          **2.     THE EUROPEAN COMMISSION'S INVESTIGATION**

22     41.     The European Commission is conducting its own separate inquiry

23  into Intel's anticompetitive practices.  The European Commission is looking into

24  allegations that Intel abused its position in the market for Windows-capable

25  microprocessors by engaging in abusive marketing practices and also that Intel

26  used its dominant position in the chip marketplace to issue unfair royalty rebates

27  and exclusive purchase agreements.

28

---

**COMPLAINT**                                                    12

42.    On <u>July 12, 2005</u>, Intel confirmed that investigators from the European Commission conducted searches at several Intel European offices as part of its ongoing investigation into Intel's business practices. These offices were in Madrid, Spain, Milan, Italy, Munich, Germany and Swindon, England. The European Commission also spent several hours at the Dell offices in Bracknell, England as well as searching other computer makes and retailers.

### 3.    THE AMD LAWSUIT AGAINST INTEL

43.    On <u>June 27, 2005</u>, AMD filed a lawsuit in the District Court of Delaware, Case No. 05-441 alleging claims for antitrust violations against Intel. This lawsuit discloses a pattern and practice by Intel of anti-competitive behavior to the detriment of all purchasers of products that contain microprocessors. For the first time, the public learned about secret deals, rebates and other anticompetitive practices that have artificially increased the price of microprocessors and limited choice.

44.    Plaintiff learned the following information from AMD's complaint which AMD has apparently learned from the companies that do business with Intel. Specifically as explained in AMD's complaint, Intel has entered into exclusive and near-exclusive deals with OEMs, unlawfully imposed restrictions by product-line, channel and/or geography, provided unlawful exclusionary rebates, threatened financial retaliation to companies that do business with Intel's competitors, interfered with AMD product launches, and unlawfully engaged in product bundling. The following are some of the examples disclosed by AMD.

### a.    <u>Dell</u>

45.    <u>**Dell**</u> has always stated that is was considering other microprocessors other than Intel's, but had no reason to switch. For example, a May 3, 2004 *Forbes* article, "AMD Sells Without Dells" states: "For at least ten years, executives at Dell have regularly been asked about using Advanced Micro Devices processors in their company's systems. . . . For years, Dell has said that it

---

COMPLAINT

13

1 continues to evaluate AMD's products but has no compelling reason to switch

2 from its all-Intel lineup." The real reason, however, that Dell sells exclusively

3 Intel microprocessors is because of Dell's fear of financial retribution from Intel if

4 it deals with Intel's competitors. It is for that reason alone that Dell only uses

5 Intel's microprocessors.

**b.    Sony**

7    46.    **Sony** cancelled plans to release the AMD Athlon because, in 2003,

8 Intel paid Sony a multimillion dollar sum disguised as discounts and promotional

9 support in exchange for Sony's exclusively use of Intel microprocessors. AMD,

10 which had a 23% share of Sony's business in 2002, saw its share drop to 8% in

11 2002 and thereafter AMD has had no business with Sony.

**c.    Toshiba**

13    47.    **Toshiba** had purchased a significant number of microprocessors from

14 AMD. However, in 2001, Intel made a substantial payment to convince Toshiba

15 not to do business with AMD. Thereafter, Toshiba stopped doing business with

16 AMD. The AMD complaint alleges that Toshiba executives told AMD that it was

17 receiving tens of millions of dollars from Intel on the condition that Toshiba did

18 not use AMD's microprocessors.

19    48.    In early 2001, Toshiba planned to use a Transmeta chip in its new

20 laptop to be released in the United States. However, Toshiba pulled the plug on

21 the notebook in the summer of 2001, blaming the decision on delays in

22 production. Recent evidence suggests Intel pressured Toshiba not to do business

23 with Transmeta.

**d.    NEC**

25    49.    In the first quarter of 2002, **NEC** purchased almost 40% of its

26 microprocessors for notebooks and desktops from AMD. Then in May of 2002,

27 Intel agreed to pay NEC more than 300 million yen (about $2.5 million U.S.

28 dollars) per quarter in exchange for Intel receiving at least 90% of NEC's business

---

**COMPLAINT**                                                                14

1    in Japan and an unknown quota for worldwide business.  By the first quarter of

2    2003, NEC had stopped purchasing any microprocessors from AMD.  According

3    to AMD, NEC states that AMD's Japanese share must stay in the single digits

4    pursuant to NEC's agreement with Intel.

5                    e.    **Fujitsu**

6          50.    In 2002, **Fujitsu** and AMD had formed an alliance to develop a low-

7    power commercial notebook which was scheduled to go to market in the first

8    quarter of 2003 and AMD spent money in anticipation thereof.  In early 2003,

9    Intel offered incentives to Fujitsu to restrict its dealings with AMD.  Shortly

10   before the launch of Fujitsu's commercial notebook, Fujitsu told AMD that Intel

11   would not allow Fujitsu to launch an AMD-powered commercial notebook and the

12   project died.  AMD remains locked-out of Fujitsu's commercial notebook lines

13   and its other notebook lines because of Intel's acts.

14         51.    In the summer of 2002, **Fujitsu**, according to AMD, informed AMD

15   that Intel had pressured Fujitsu to remove AMD-powered desktop websites from

16   its website.

17                    f.    **Hitachi**

18         52.    Intel entered into an exclusive-dealing arrangement with **Hitachi** and

19   the company changed from a substantial AMD customer in early 2002 to one

20   selling no non-Intel  microprocessors by mid-year.

21                    g.    **Gateway/eMachines**

22         53.    **Gateway/e Machines** exclusively purchased microprocessors from

23   Intel from 2001-2004.  Its former CEO, Ted Waitt, told an AMD executive that

24   Intel offered him large sums not to deal with AMD.

25         54.    With regard to the limited amount Gateway has purchased from

26   AMD,  Gateway executives told AMD that Intel has beaten them into "guacamole"

27   in retaliation for these dealings.

28

---

**COMPLAINT**                                                    15

### h.    **Hewlett Packard**

55.   In 2002, **Hewlett Packard ("HP")** demanded $25 million quarterly from AMD to compensate for Intel's expected retaliation if the companies did business. AMD agreed instead to provide HP with its first million microprocessors for free. However, when Intel learned of the agreement, it pressured HP not to accept the AMD microprocessors. As a result, HP only took 160,000 free microprocessors.

56.   HP also would not carry an AMD-powered notebook because, as it told AMD, it had received $3 million to $4 million from Intel to lock-up the notebook market. Consequently, HP is an "insignificant" part of AMD's business.

### i.    **IBM**

57.   In August 2000, **IBM** and AMD were negotiating a proposed commercial PC business partnership. Seven months later, with the deal nearing completion, Intel offered IBM a "preferred supplier" deal where it would receive incentives for Intel being the exclusive supplier for microprocessors in commercial products. IBM accepted this deal and ended discussions with AMD. Intel also acted to thwart AMD's efforts to enter into a partnership with IBM for servers.

58.   Additionally, in April 2003, while IBM had joined AMD as a "launch partner" for its Opteron 64-bit server, Intel paid money to IBM to back-off its aggressive marketing of the Opteron and thereafter IBM substantially reduced its marketing.

### j.    **Rebates, Threats and Other Unlawful Acts**

59.   Intel has also structured its rebates to have the anti-competitive effect of creating an exclusive or near-exclusive dealing arrangement, thus shutting out competition. To accomplish this anti-competitive goal, Intel sets the sales required for each company to receive quarterly rebates so high that they can only meet the quota if almost all their sales are products which contain Intel microprocessors. If a company does not meet its quota, the company does not

---

**COMPLAINT**                        16

1 receive any rebate. There are other rebate programs, all which have the effect of
2 increasing sales of Intel's microprocessor.

3     60. According to AMD, Intel has also made specific threats to companies
4 who want to do business with Intel competitors. For example:

5     • Compaq's Chief Executive Officer, Michael Capellas, told AMD that
6 Intel had withheld delivery of much needed server chips because of the volume of
7 business Compaq gave to AMD.

8     • In 2002, Intel threatened NEC that it would discontinue providing
9 NEC with the technological roadmap for future Intel products if NEC did not
10 convert its entire line of Value Star L computers to Intel microprocessors and as a
11 result, in 2002 and 2004, NEC did not use AMD microprocessors in these
12 computers.

13     • In 2003, according to information AMD learned from Acer, Intel told
14 Acer that it would increase chipset prices on all Intel-based Acer systems by $10 if
15 Acer awarded any processor business to AMD outside of Europe. This threat
16 came on the eve of the AMD Athlon XP launch which Acer had committed to
17 launch. However, because of Intel's threat, Acer pulled out of the launch.

18     61. Intel also interfered with AMD's product launches by coercing
19 companies to withdraw their support for AMD products. One such example, given
20 by AMD, is a threat that Intel's then CEO, Craig Barrett, made to Acer's
21 Chairman, CEO and President. At a time when Intel owed Acer $15-20 million in
22 market development funds, Barrett warned that Acer would suffer severe
23 consequences if it supported AMD's launch of the Athlon64. In response, Acer
24 withdrew from the launch in the United States and Taiwan, pulled its promotional
25 materials, banned AMD's use of a video and delayed its announcement of its
26 Athlon64-powered computers. Acer's President subsequently reported to AMD
27 that the only thing different about this message was that the messages usually
28 came from "lower ranking managers" not Intel's CEO.

62.    Intel also uses product bundling to obtain a competitive advantage. By forcing OEMS to buy one product to obtain a more desirable product, Intel increases prices and excludes competitors from the marketplace.

### k.    Monopolization of Retailers' and Distributors' Markets

63.    Besides targeting the OEMs, Intel has also targeted the distributors and retailers to whom the OEM sells the computers. Intel offers discounts, rebates and specialized programs designed to insure that almost all of the retailers' sales must be of Intel product. It has entered into exclusive deals with many retailers around the world. For example, until recently, Office Depot refused to sell AMD-powered notebooks because it feared it would lose Intel's money. Intel offered Fry's, another large retailer, money to take Fujitsu's Athlon EX-based notebook off its shelves. Since 1997, Intel has shut out its competitors completely in Media Markt, Europe's largest computer retailer based upon payments by Intel of $15-20 million annually.

64.    In the United Kingdom, Toys-R-Us only uses Intel products and almost all the business of Dixon Services Group, operator of three major chains, is with Intel. Dixon Services Group has agreed to keep non-Intel products at less than 10% of its business in exchange for money from Intel. It has been punished by Intel for the small amount of business it has done with AMD.

65.    In addition, in order to obtain shelf-space, manufacturers often must pay funds, called "market development funds," to retailers for shelf space for their product or pay for advertising. The market development funds are a critical element of a retailer's choice of product. An IDC personal computer analyst states that the amount spent advertising is substantial; sometimes it totals 70% of a computer maker's ad budget. Intel has expended substantial amounts of money to obtain the best shelf space and its name in advertisements, as is evidenced by the many computer ads which state: "Intel inside."

---

66.    Intel has also worked to exclude competitors' technologies from being compatible with industry standards. Industry groups work together to create an industry standard so that computer manufacturers can purchase components from more than one manufacturer. Intel has attempted to have the industry association adopt standards on microprocessors that have no substantial consumer benefit, but benefit Intel to the detriment of its competitors.

**D.    RELEVANT MARKET**

67.    The relevant product market for microprocessors is the entire world, with Intel having had approximately an 80% market share for the last twenty years.

**E.    THE EFFECT OF INTEL'S ACTS HAS BEEN TO DECREASE COMPETITION, DECREASE CONSUMER CHOICE AND INCREASE PRICES**

68.    The result of Intel's conduct acting alone and with the assistance of the unnamed co-conspirators has been to decrease competition in the microprocessor industry throughout the world, decrease consumer choice and increase the prices paid by consumers like Plaintiff for computers and other products that use microprocessors. This damage is continuing and will continue to occur.

69.    The illegal acts of Intel have been a substantial factor in causing Plaintiff and the Class to pay higher prices for products containing microprocessors than they would have paid except for Intel's anti-competitive conduct. Plaintiff and each of the class members have been injured and financially damaged in their business and property in an amount to be determined according to proof.

70.    On August 27, 2004, InfoWorld Media Group explained the importance of Intel's competition with AMD: "Competition from AMD has reversed the trend of rising prices and stagnant innovation that characterizes a controlled market. AMD is responsible for $500 desktops, $1,200 rack servers

---

**COMPLAINT**                                                                                    19

1   and multigigahertz mainstream microprocessors, despite the fact that most of them
2   have Intel's logo on them." Unless competition is restored to the microprocessor
3   industry, prices will raise once against and innovation stagnate.
4       **F.    TOLLING OF THE STATUTE OF LIMITATIONS**
5       71.    Throughout the period set forth in this Complaint, Intel and its co-
6   conspirators concealed Intel's unlawful conduct from Plaintiff and the Class.
7   Intel's and the co-conspirators' acts were by their nature inherently self-
8   concealing.
9       72.    Until the allegations of the JFTC and the AMD complaint, Plaintiff
10  and members of the Class had no knowledge of the illegal acts, or of any facts that
11  might have led to the discovery thereof in the exercise of reasonable diligence.
12      73.    The affirmative actions of Intel and the co-conspirators heretofore
13  alleged were concealed and carried out in a manner that precluded detection.
14  Plaintiff and members of the Class could not have discovered the existence of the
15  facts alleged herein at an earlier date by the exercise of reasonable due diligence
16  because of the deceptive practices and techniques of secrecy employed by Intel
17  and others to avoid detection.
18      74.    As a result of the concealment of the illegal acts, Plaintiff and the
19  Class assert the tolling of the applicable statute of limitations affecting the rights
20  of action by Plaintiff and the members of the Class.
21                 **FIRST CLAIM FOR RELIEF**
22               **VIOLATION OF ANTITRUST ACT AND**
23     **REQUEST FOR INJUNCTION AND DECLARATORY RELIEF**
24         **(15 U.S.C. §§ 2, 26; 28 U.S.C. § 2201(a))**
25      75.    Plaintiff and the Class incorporate and reallege all of the foregoing
26  paragraphs, as though fully set forth herein.
27      76.    Intel has knowingly and wilfully monopolized, for twenty or more
28  years, and continues to monopolize the microprocessor industry both acting alone

---

1    and/or as part of a conspiracy and combination to monopolize with the unnamed
2    co-conspirators.  This conspiracy is between Intel and certain of its OEMs,
3    distributors and/or retailers who have knowingly agreed with Intel to have Intel
4    monopolize the microprocessor industry.  Because of its dominant market power,
5    holding about 80% of the microprocessor market, Intel's actions have had a
6    serious and detrimental impact on competition in the microprocessor market, to
7    the injury of Plaintiff and the Class.

8         77.    This course of conduct includes the following actions carried out both
9    by Intel acting alone and also as part of the conspiracy:

10        a.    Intel has entered into exclusive and near-exclusive deals with OEMs;
11        b.    Intel has unlawfully imposed restrictions by product-line, channel or
12             geography;
13        c.    Intel has provided unlawful exclusionary rebates;
14        d.    Intel has threatened financial retaliation to companies that do
15             business with Intel's competitors;
16        e.    Intel has interfered with AMD product launches; and
17        f.    Intel has unlawfully engaged in product bundling.

18        78.    Intel has intentionally and wrongfully created and maintained a
19   monopoly in the microprocessor industry through anticompetitive actions in
20   violation of 15 U.S.C. § 2 (Section 2 of the Sherman Act).

21        79.    As a result of these actions, competitors have been unnecessarily
22   excluded from the marketplace and competition has decreased thereby increasing
23   the price of the products containing microprocessors and decreasing choice.

24        80.    Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure
25   Rule 57, Plaintiff and the Class seek a declaration that Intel's actions are
26   anticompetitive and have created and continue to create a monopoly in violation of
27   15 U.S.C. § 2.

28

------------------------------------------------------------

**COMPLAINT**                                                                 21

81.     Pursuant to 15 U.S.C. § 26 (Clayton Act § 16), Plaintiff and the Class seek equitable and injunctive relief to enjoin Intel from its conduct which has created an anticompetitive effect in the microprocessor industry.  Specifically, Plaintiff and the Class request that Intel be enjoined from: (a) entering into exclusive and near-exclusive deals with OEMs; (b) unlawfully imposing restrictions by product-line, channel or geography; (c) providing unlawful exclusionary rebates; (d) threatening financial retaliation to companies that do business with Intel's competitors; (e) interfering with competitors' product launches; and (f) unlawfully engaging in product bundling.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF CARTWRIGHT ACT
## AND REQUEST FOR DAMAGES
### (California Business & Professions Code §§ 16700, et seq.)

82.     Plaintiff and the Class incorporate and reallege all of the foregoing paragraphs, as though fully set forth herein.

83.     Intel and its unnamed co-conspirators violated California Business and Professions Code sections 16700, et seq. (the "Cartwright Act"), by forming one or more combinations to accomplish purposes prohibited by and contrary to the Cartwright Act.  They engaged in an agreement, contract, combination, trust and/or conspiracy to create and maintain an Intel monopoly in the microprocessor market which artificially inflated the price for products containing microprocessors and limited the choices for consumers.

84.     Intel and its unnamed co-conspirators committed acts that constituted prohibited conduct under the Cartwright Act, including but not limited to making illegal agreements among themselves to reduce competition and to raise the price of products containing microprocessors; carrying out restrictions in the microprocessor industry by limiting the companies which could purchase Intel's

---

competitors' products to resell to Plaintiff and the Class, agreeing to illegal exclusive dealing arrangements, typing arrangements, rebates and discounts, and other such conduct. This conduct has unfairly and unlawfully increased the prices of products containing microprocessors and limited consumer choice.

85.    The unlawful and unfair actions of Intel and its unnamed co-conspirators, which actions are continuing, were a substantial factor in causing injury to Plaintiff and the Class in their business or property. They have had to pay more for products containing microprocessors than they would have absent the illegal and anti-competitive conspiracy. These acts have caused and will continue to cause damages to Plaintiff and the Class in an amount to be proven at trial.

86.    Also as a direct and legal result of the acts of Intel and the unnamed co-conspirators, Plaintiff and the Class were required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which it seeks recovery according to proof.

87.    Pursuant to the Cartwright Act, Plaintiff and the Class authorized to recover three times the damages it sustained plus interest and reasonable attorneys' fees, costs and expenses. California Business & Professions Code § 16750.

88.    In addition, the Court should enter a preliminary and permanent injunction enjoining Intel's wrongful conduct.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF UNFAIR COMPETITION LAW AND
### REQUEST FOR RESTITUTION AND INJUNCTION
### (California Business & Professions Code §§17200 *et seq.*)

89.    Plaintiff and the Class incorporate and reallege all of the foregoing paragraphs, as though fully set forth herein.

90.     Intel has engaged in unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.* because its conduct was fraudulent, unfair and/or illegal as herein alleged.  Intel's conduct caused injury to Plaintiff and the Class.

91.     Intel's business acts and practices, as alleged herein, constituted and constitute a continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of the Unfair Competition Law including, but in no way limited to, the following:

a.     Intel's actions, set forth above, are unlawful and in violation of 15 U.S.C. § 2, California Business & Professions Code §§ 16700 *et seq.* and 17000 *et seq.*;

b.     Intel's business acts and practices, are unfair in that they artificially inflated the price of microprocessors and reduced the choice of products for the consumer through improper means.

c.     Intel's business acts and practices are fraudulent because, as a result of their actions, members of the public are likely to be wrongfully deceived into believing that Intel's microprocessors are superior to those of its competitors since certain OEMS do not use non-Intel microprocessors and certain retailers do not sell products containing non-Intel microprocessors.

92.     Intel's business acts and practices, as alleged herein, are continuing and have caused and will continue to cause Plaintiff and the Class to purchase the products containing microprocessors at artificially inflated prices and limited the choices available to them.

93.     Plaintiff and the Class are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits, and such other relief that the court deems just in light of the ill gotten gains

1  obtained by Intel as a result of such business acts or practices and enjoining Intel
2  to cease and desist from engaging in the practices described herein.

3  WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

4  **PRAYER FOR RELIEF**

5  Based on the allegations stated above, Plaintiff and the Class pray for the
6  following relief:

7  1.  For certification of a Plaintiff Class pursuant to Rule 23 of the
8  Federal Rules of Civil Procedure;

9  2.  For an injunction ordering Intel to cease and desist from engaging in
10 the unfair, unlawful, and/or fraudulent practices alleged in the Complaint;
11 including the following acts: (a) entering into exclusive and near-exclusive deals
12 with OEMs; (b) unlawfully imposing restrictions by product-line, channel or
13 geography;(c) providing unlawful exclusionary rebates; (d) threatening financial
14 retaliation to companies that do business with Intel's competitors; (e) interfering
15 with competitors' product launches; and (f) unlawfully engaging in product
16 bundling under 15 U.S.C. § 26 and California law.

17 3.  For a declaration pursuant to 28 U.S.C. § 2201(a) and Federal Rules
18 of Civil Procedure Rule 57 that Intel's actions are anticompetitive and have
19 created and continue to create a monopoly in violation of 15 U.S.C. § 2;

20 4.  For damages, trebled, according to proof pursuant to Cal. Bus. &
21 Prof. Code § 16750;

22 5.  For restitution according to proof pursuant to Cal. Bus. & Prof. Code
23 § 17200.

24 6.  Reasonable attorneys' fees;

25 7.  Costs and expenses of the proceedings;

26
27
28

---

**COMPLAINT**                                                    25

8.     Prejudgment interest at the maximum legal rate; and

9.     Such other and further relief as the Court deems proper.

Dated: July 25, 2005        **COTCHETT, PITRE, SIMON & McCARTHY**

By: _____
          NANCY L. FINEMAN
          *Attorneys for Plaintiff and the Class*

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Prudential, individually and on behalf of all others similarly situated, demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: July 25, 2005        **COTCHETT, PITRE, SIMON & McCARTHY**

By: _____
          NANCY L. FINEMAN
          *Attorneys for Plaintiff and the Class*